In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-02-067 CV


____________________



EDDIE MERCER, Appellant



V.



ANGEL RACING, INC., Appellee






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. A-164,536






OPINION


 This is an appeal from the trial court's denial of a special appearance filed by
appellant. Appellee filed suit alleging breach of contract and conversion in connection
with an attempted sale of a trailer. The record indicates that appellant supported his
special appearance motion with affidavits. Appellee filed a written response with
attachments, consisting, most notably, of appellant's deposition testimony. A brief
"hearing" was held in which counsel for the parties appeared and argued law to the trial
court. At the conclusion of the "hearing," the trial court denied appellant's motion. This
appeal followed. 

 The basis of appellant's special appearance motion is that he is a Florida resident
and has no contacts, minimum or otherwise, with Texas. The Texas long-arm statute
authorizes the exercise of jurisdiction over nonresidents "doing business" in Texas. Tex.
Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). Although it lists particular acts
which constitute "doing business," the statute also provides that the nonresident's "other
acts" may satisfy the "doing business" requirement. Id. See Schlobohm v. Schapiro, 784
S.W.2d 355, 356-57 (Tex. 1990). The broad language of the long-arm statute's "doing
business" requirement permits the statute to reach as far as the federal constitutional
requirements of due process will allow. Id. at 357; U-Anchor Adver., Inc. v. Burt, 553
S.W.2d 760, 762 (Tex. 1977). As a result, a reviewing court only considers whether it
is consistent with federal constitutional requirements of due process for Texas courts to
assert in personam jurisdiction over appellant. See Helicopteros Nacionales de Colombia
v. Hall, 466 U.S. 408, 412-14, 104 S.Ct. 1868, 80 L.Ed.2d 404, 409-11 (1984). 

 Federal constitutional requirements of due process limit the power of the State to
assert personal jurisdiction over a nonresident defendant such as appellant. 466 U.S. at
413-14. The United States Supreme Court divides the due process requirements into two
parts: (1) whether the nonresident defendant has purposely established "minimum contacts"
with the forum state; and (2) if so, whether the exercise of jurisdiction comports with "fair
play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105
S.Ct. 2174, 85 L.Ed.2d 528 (1985); see also Helicopteros, 466 U.S. at 414. As we
appreciate this due process requirement, if the record does not establish a defendant's
"minimum contacts," the inquiry ends and the reviewing court does not reach the "fair
play and substantial justice" part. See Burger King Corp., 471 U.S. at 476. 

STANDARD OF REVIEW


 Whether personal jurisdiction exists is a question of law. However, proper exercise
of that jurisdiction may require the resolution of underlying factual disputes. See Conner
v. ContiCarriers and Terminals, Inc., 944 S.W.2d 405, 411 (Tex. App.--Houston [14th
Dist.] 1997, no writ). Although normally reviewed for factual sufficiency, if the trial
court's order is based upon undisputed or otherwise established facts, we conduct a de
novo review of the order denying the special appearance. See Riviera Operating Corp. v.
Dawson, 29 S.W.3d 905, 908 (Tex. App.--Beaumont 2000, pet. denied). A defendant
who challenges a court's exercise of personal jurisdiction through a special appearance
carries the burden of negating all bases of personal jurisdiction. See CSR Ltd. v. Link, 925
S.W.2d 591, 596 (Tex. 1996). "Once the defendant has produced credible evidence
negating all bases of jurisdiction, the plaintiff bears the ultimate burden to establish that
the Texas court has personal jurisdiction over the defendant as a matter of law." Riviera
Operating Corp., 29 S.W.3d at 908. 

 "The Due Process Clause protects an individual's liberty interest in not being
subject to the binding judgments of a forum with which he has established no meaningful
'contacts, ties, or relations.'" Burger King Corp., 471 U.S. at 471-72 (quoting 
International Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95
(1945)). By requiring that individuals have "fair warning that a particular activity may
subject [them] to the jurisdiction of a foreign sovereign," the due process clause "gives a
degree of predictability to the legal system that allows potential defendants to structure
their primary conduct with some minimum assurance as to where that conduct will and will
not render them liable to suit." Burger King Corp., 471 U.S. at 472 (quoting Shaffer v.
Heitner, 433 U.S. 186, 218, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (Stevens, J.,
concurring)) (also quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297,
100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). 

 The "fair warning" requirement is satisfied if the record reflects that a nonresident
defendant has purposefully availed himself of the privilege of conducting activities within
the forum state, thus invoking the benefits and protections of its laws. Burger King Corp.,
471 U.S. at 474-75. This "purposeful availment" factor ensures that a nonresident
defendant will not be haled into a jurisdiction based solely upon "random," "fortuitous,"
or "attenuated" contacts or the "unilateral activity of another party of a third person." Id.
at 475; Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815
S.W.2d 223, 226 (Tex. 1991). Thus, for due process purposes, the focus is whether the
nonresident defendant purposefully established "minimum contacts" within the forum
State. Burger King Corp., 471 U.S. at 474. These "minimum contacts" result from
actions by the defendant himself that create, for purposes of personal jurisdiction, a
"substantial connection" with the forum State. Id. at 475. 

 The United States Supreme Court has further refined the "minimum contacts"
analysis by noting a distinction between "specific" and "general" jurisdiction. 
Helicopteros, 466 U.S. at 414. The Texas Supreme Court in Guardian Royal described
it thusly:

 When specific jurisdiction is asserted, the cause of action must arise
out of or relate to the nonresident defendant's contact with the forum state
in order to satisfy the minimum contacts requirements. However, the
contact must have resulted from the nonresident defendant's purposeful
conduct and not the unilateral activity of the plaintiff or others. 
Furthermore, the nonresident defendant's activities must have been
"purposefully directed" to the forum and the litigation must result from
alleged injuries that "arise out of or relate to" those activities. When
specific jurisdiction is asserted, the minimum contacts analysis focuses on the
relationship among the defendant, the forum and the litigation. 


 General jurisdiction may be asserted when the cause of action does not
arise from or relate to the nonresident defendant's purposeful conduct within
the forum state but there are continuous and systematic contacts between the
non-resident defendant and the forum state. When general jurisdiction is
asserted, the minimum contacts analysis is more demanding and requires a
showing of substantial activities in the forum state. 


Guardian Royal, 815 S.W.2d at 227-28 (citations omitted). Unless it is determined that
the nonresident defendant has purposefully established minimum contacts with the forum
state, a reviewing court does not reach the issue of whether the forum state's assertion of
personal jurisdiction comports with "fair play and substantial justice." Id. at 228. Finally,
when specific jurisdiction is asserted, the "minimum contacts" analysis focuses on the
relationship among the defendant, the forum, and the litigation. Id.; Schlobohm, 784
S.W.2d at 357. 

ANALYSIS


 In the instant case, appellee places appellant's relationship to Texas in the following
factual context: (1) appellant operated an internet website, (2) appellant owned a business
which transported vehicles to Texas, (3) appellant negotiated an oral contract via telephone
with a Texas resident, and (4) appellant's wiring of partial payment of $50,000 to a Texas
bank. 

 Although appellant acknowledged the existence of a website, the record before us
contains no evidence that appellant transacted any business with Texas residents over the
internet website. Appellee provides no record references in support of its position. Thus,
no minimum contacts are shown concerning this allegation.

 Appellee's second allegation, that appellant's contacts with Texas include a business
"which transports vehicles to Texas," is presented without references to the record where
such a fact is shown. Appellant's affidavit indicates the following pertinent parts: 

 I do not own an interest in any business that has a principal place, or any
place of business, located in the State of Texas, or that does business in
Texas, other than my interest in securities, which are publicly traded, with
companies which may do business in Texas. . . . Certain companies in
which I have an ownership interest that do business in Florida may have
delivered vehicles to Texas in the past on an infrequent, sporadic basis but
I had no personal involvement in any such shipments and I was not aware of
the shipments until shortly before executing this affidavit. 


 Any possible or alleged contacts by me with the State of Texas in matters
unrelated to the alleged agreement out of which this matter arises are
incidental and trivial. 


 Appellee provides no affidavits or deposition testimony contradicting, explaining,
or expanding on appellant's testimony. Nor does appellee supply any other evidence
taking issue or contradicting appellant's testimony. Without more, we simply cannot say
that the evidence before us indicates appellant's automobile transport business engaged in
"purposefully directed" activities to Texas. Indeed, this allegation by appellee is more
akin to a general jurisdiction assertion involving "continuous and systematic contacts," a
position which appellee disavowed in its brief. As appellee stated, "Although Mercer's
contacts to Texas include an Internet site, which is accessible to Texas residents and a
business which transports vehicles to Texas, this is a case of specific jurisdiction rather
than general jurisdiction." (1) 

 Appellee's final two allegations are directed specifically at the instant litigation, and,
therefore, to the claim of specific jurisdiction. With regard to the "contract" negotiation,
appellee states: "Here, Mercer negotiated an oral contract with a Texas resident over the
telephone. The telephone conversation occurred when Mercer was in Florida and Glen W.
Morgan, the CEO of Angel Racing, Inc., was in Texas. The price of the vehicle [sic] was
negotiated over the telephone, the terms of the wire transfer were negotiated over the
telephone, and the details of delivering the truck [sic] were negotiated over the telephone." 
Again, we are provided no record references in support of these "factual" assertions;
however, appellant's affidavit and deposition are helpful. 



 Appellant's affidavit contains the following: 

 The claims asserted in this action did not arise in whole or in part in the
State of Texas. The alleged agreement out of which this matter arises was
made in Florida or North Carolina, not in Texas.


 I did not place any telephone calls relating to the alleged agreement out of
which this matter arises to any person or entity located in the State of Texas. 
All of my dealings relating to the alleged agreement out of which this matter
arose were conducted by me from my office or home in Florida. At no time
have I traveled to Texas for any reason relating to the alleged agreement out
of which this matter arose. All contacts as to the transaction in question
resulted from solicitations and/or advertisements by Plaintiff or on Plaintiff's
behalf distributed to Florida and that were received by me in Florida. In
response to such advertisements, I called a 1-800 number identified in such
advertisement and was referred to a different number having an area code
"704." Telephone numbers having area code number 704 are telephone
numbers for North Carolina. 


 When I did speak with Glen Morgan, I was unaware that he was located in
Texas because the majority of my contact was with Mark Ringler, Mr.
Morgan's representative whom I believed was based in North Carolina. 
Additionally, I was not aware that I was wiring funds to a bank in Beaumont,
Texas as the transaction was handled by Tina Smith. 


Appellant's deposition reflects the following with regard to any contact with Glen Morgan:
 Q.[Appellee's counsel] How did you first learn of the trailer? 


 A.[Appellant] It was advertised in the National Speed Sport News. 


 . . . .


 Q. What did you do when you saw the advertisement?


 A. I called. There was a 1-800 number and a North Carolina number
because I recognized 704 because I buy a lot of parts out of North Carolina. 
I called the 1-800 number, and the lady answered the phone, and she said
something I didn't understand what she said. But she - - I asked her about
the trailer, and she said I needed to call the 704 number. So, I called it; and
I got a guy named Mark Ringwald - -


 Q. Mark Ringler?


 A. - - Ringler or Ringwald or something. Anyway, he told me that he was
disposing of the assets of Angel Racing - - you know, an employee of Angel
Racing and he was disposing of the assets; and he told me all about the
trailer. 


 . . . .


 Q. Okay. And how much was the trailer being asked for - - how much was
being asked for the trailer?


 A. I think 75,000. They had a truck and a trailer, but they were separating
them. I think the trailer broke out at 75,000. I mean, they might have been
asking 79,000 and sold for 75. I don't remember that part. But it was
75,000.


 Q. In the 70s?


 A. Yeah.


 Q. All right. Well, did you just send a check up there? What did you do
next?


 A. I questioned - - you know, kind of tried to get the trailer and check it
out, tried to get a friend to go by there and look at it. 


 Q. Did you try to negotiate the price with him at all?


 A. With - - yeah, I mean, I probably offered him less; and he wouldn't take
less.


 Q. Did you - - 


 A. But I offered him less.


 Q. - - with Mark Ringler or with - - did you call anybody back down in the
800 number or the - - in Houston or Beaumont?


 A. Well, I spoke with Glen Morgan.


 Q. When did you speak with him?


 A. Sometime in the - - in the dealings. It took a while because once we
ever decided that we were going to buy it, they were supposed to deliver it
the next week; and it took them like a month to get it to me. 


 Q. So, you spoke with Glen Morgan?


 A. Uh-huh.


 Q. Was that kind of trying to negotiate the price down or - -


 A. Well, I only recall speaking to him one time; and he just told me how
great the trailer was and how nice all his stuff was. You know, if I didn't
like it, I didn't own it. It was - - I would be well-satisfied. He explained to
me that he had - - he said to me, "Eddie, you don't know me; but I have - -
you know, I have really nice stuff. I bought all my cars from Hendricks. 
And I have really nice stuff, and you'll be real pleased with this trailer. 
You're making a great buy." I said, "I hope you're right."


 Q. Now, did you call Mr. Morgan or did he call you?


 A. I think Ringler put that together for us to talk.


 Q. Okay.


 A. I don't think Glen is somebody you can just pick the phone up and call.


 Q. Okay. So, do you remem - - so, my question was: Did you call - -


 A. I think Mr. Ringler had him call me. You know, I just did all my
dealings with Mark Ringler except for the one conversation I had with Glen
assuring me what a nice trailer it was. 


 Q. Now, did you - - did y'all finally negotiate a price?


 A. Yeah. I mean, he just - - basically just said that's the least he would
take; and I said okay. It wasn't much negotiating. He was pretty firm. 


 Q. Okay. Mr. Ringler or Mr. Morgan?


 A. Mr. Morgan. 


 . . . .


 Q. All right. Did you ever raise this point [possible damage to trailer] up
with Mr. Morgan?


 A. No. I never talked to him until after it got to Florida again.


 Q. Okay. But before it left - - was it North Carolina or South Carolina? 


 A. North Carolina. 


 Q. Before it left North Carolina, you and he had agreed on a price, right?


 A. Correct.


 . . . .


 Q. Okay. Did y'all - - did y'all talk about the - - the money, you and Mr.
Morgan, prior to the money being wired anywhere - - the 50,000?


 A. Well, he wanted me to wire him all the money; but I wouldn't.


 Q. He also said you didn't have to wire him any of the money too, didn't
he?


 A. No. 


 Q. No, he didn't?


 A. No. He wasn't going to bring me the trailer without money.


 . . . .


 Q. So, you talked to Mr. Morgan while the trailer was in North Carolina?


 A. Uh-huh.


 Q. Okay. Just a second ago you said you didn't speak to Mr. Morgan until
it got to Florida.


 A. No. I said it [sic] I talked to him one time before it got to Florida. Then
I talked to him after it got to Florida trying to work out the mess of me not
wanting it.


 Q. Okay. So, in North Carolina - - tell me about the conversation between
you and Mr. Morgan with regard to the transfer of money.


 A. He wanted me to wire him the full amount and he bring me the trailer,
and I wouldn't. I told him I'd send him $50,000, you know; and upon
inspection and - - delivery and inspection, I'd pay him the balance. 


 Q. Uh-huh.


 A. And he finally agreed to that, but he wasn't - - you know, I don't recall
him saying he'd bring it down here for nothing because he was pretty
reluctant to take a $50,000 deposit on it. 


 The question is: Did Mercer "purposefully direct" the above referenced "activities"
to Texas? As previously stated, a party challenging personal jurisdiction via special
appearance must carry its burden of negating "all bases of personal jurisdiction to prevail
in a special appearance." CSR Ltd., 925 S.W.2d at 596 (citing Kawasaki Steel Corp. v.
Middleton, 699 S.W.2d 199, 203 (Tex. 1985)).

 In admitting to a telephone conversation with Morgan, Mercer does not specifically
deny making that contact of his own volition. It is obvious that as a result of this telephone
discussion, an agreement was reached that Mercer would purchase the trailer from
Morgan. To further support an agreement between Mercer in Florida and Morgan in
Texas, Mercer caused to be wired a payment to a Texas bank; it matters not that Mercer's
secretary may have handled the mechanics of this act.

 We find the present case uncannily similar to Bissbort v. Wright, 801 S.W.2d 588
(Tex. App.--Fort Worth 1990, no writ). There, Wright purposefully acted and
consummated a transaction in Texas by initiating negotiations with its telephone call to
Bissbort. Albeit, the Bissbort case culminated in a written contract as opposed to our oral
agreement, in Bissbort, over fifty-one-thousand dollars was wired by Wright to a Texas
bank for Bissbort's benefit. Id.

 The Bissbort Court determined: 

 Wright purposefully acted or consummated a transaction in Texas in
initiating negotiations with its telephone call to Bissbort, by executing and
returning to Texas a contract requiring it to make payment in Texas and by
wiring the $51,230.00 to Bissbort's account with a bank in Texas. Because
Bissbort's cause of action was one for nonpayment under the contract, an
exercise of jurisdiction would meet the second requirement of the Texas
formula.


Id. at 589.


 Clearly, the facts and circumstances of our case will not justify general jurisdiction,
which requires continuous and systematic contact. However, Mercer purposefully
established minimum contact with Texas by directing that his partial payment of
$50,000.00 be wired to a Texas bank. Nothing in our record reveals a requirement by
Morgan that payment be made in such manner and nothing in the record explains why
Mercer could not have given Morgan drafting instructions on a Florida bank. Mercer, in
his special appearance motion, contends that he has no contacts, minimum or otherwise,
with Texas. Mercer's deposition proves the contrary; thus all bases of jurisdiction have
not been negated. 



 Appellant cites Helicopteros, 466 U.S. at 413-14, for the proposition that personal
jurisdiction over a nonresident defendant in Texas is proper only in situations where the
requirements of the due process clause of the Fourteenth Amendment of the United States
Constitution and the Texas long-arm statute are satisfied. In Helicopteros, our U.S.
Supreme Court explained:

 There is no indication that [nonresident defendant] ever requested that
the checks be drawn on a Texas bank or that there was any negotiation
between [nonresident defendant] and [a Houston joint venture] with respect
to the location or identity of the bank on which checks would be drawn. 
Common sense and everyday experience suggest that, absent unusual
circumstances, the bank on which a check is drawn is generally of little
consequence to the payee and is a matter left to the discretion of the drawer. 
Such unilateral activity of another party or a third person is not an
appropriate consideration when determining whether a defendant has
sufficient contacts with a forum State to justify assertion of jurisdiction.


466 U.S. at 416-17 (footnote and citations omitted).

 

 Though we certainly adhere to the Supreme Court's decision in Helicopteros, we
must point out that there exists a payor/payee roll reversal between our case and
Helicopteros. We glean from Helicopteros that the simple receipt of checks drawn on a
Texas banking institution at the instruction of payor, and not payee, does not impose a
"contact" or "contacts" with the Texas forum sufficient to justify Texas jurisdiction. To
extrapolate somewhat on the Supreme Court's "common sense" reference, in jurisdictional
questions it is the conduct of the nonresident, not the resident, that triggers jurisdiction.

 As in Bissbort, though Mercer's contacts were few and limited, we likewise hold
that because of the quality of those acts, particularly the act of wiring a large sum of
money to the bank in Texas, Mercer "availed [himself] of the protection and remedies of
Texas law and Texas courts." Bissbort, 801 S.W.2d at 589. Bissbort states:

 When Wright wired $51,230.00 to Texas, it took advantage of the protection
from misappropriation provided by Texas law and implicitly expressed
confidence in Texas courts to provide a remedy if misappropriation
occurred. Additionally, there is nothing in the record which indicates
Wright would be excessively burdened or inconvenienced by litigating in a
Texas court.


Id.


Therefore, we hold that Mercer's business dealing with the Texas forum was sufficient to
establish minimum contacts for jurisdictional purposes.

 Having determined that Mercer purposefully established minimum contacts with the
forum, Texas, we must now decide whether those contacts were sufficient to satisfy the
concepts of fair play and substantial justice. "[O]nce minimum contacts are established,
the exercise of jurisdiction will rarely fail to comport with fair play and substantial
justice." P.V.F., Inc. v. Pro Metals, Inc., 60 S.W.3d 320, 325 (Tex. App.--Houston
[14th Dist.] 2001, pet. denied) (citing In re S.A.V., 837 S.W.2d 80, 85 (Tex. 1992)).

 There are several considerations which may be used by courts in determining the
fair play/substantial justice requirement. Some of these factors are: "(1) the state in which
the agreement was solicited (and by whom), negotiated, consummated, and performed; (2)
whether, after entering into the agreement, the nonresident directed communications to
Texas in furtherance of the transaction(s); (3) whether the nonresident earned a profit in
Texas from the transaction(s); (4) whether the nonresident paid the cost to ship the goods
from Texas; (5) whether the nonresident placed follow-up orders; (6) whether Texas law
governed the transactions; and (7) whether payments were sent or to be sent to Texas." 
P.V.F., Inc., 60 S.W.3d at 325 n.10. Additionally, Guardian Royal includes these
factors: "(1) the burden on the defendant; (2) the interests of the forum state in
adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective
relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution
of controversies; and (5) the shared interest of the several states in furthering fundamental
substantive social policies." Guardian Royal, 815 S.W.2d at 232 (footnote omitted).

 In considering the factors suggested above, we note that Mercer's activity in Texas
justifies a conclusion that he should expect to be called to our courts. The evidence in the
record does not indicate that litigation in a Texas court would be excessively burdensome
to him. Further, Texas has an interest in adjudicating disputes between its residents and
nonresidents, particularly since Mercer caused the payment for his purchase to be wired
to a Texas bank. There is no evidence showing another state's social policy interest is
greater than that of Texas. Litigation in Texas will provide both parties with the protection
and benefits of our laws. We find that the exercise of jurisdiction over Mercer by a Texas
court does not offend traditional notions of fair play and substantial justice. 

 We affirm the trial court's denial of appellant's jurisdictional plea.

 AFFIRMED.


 _______________________________

 RONALD L. WALKER

 Chief Justice 



Submitted on May 14, 2002

Opinion Delivered July 11, 2002

Do Not Publish 


Before Walker, C.J., Burgess and Gaultney, JJ.
1. See Experimental Aircraft Ass'n, Inc. v. Doctor, No. 14-01-00282-CV, 2002 WL
246282, at *3-9 (Tex. App.--Houston [14th Dist.] Feb. 21, 2002, no pet. h.).